NOTICE

Decision filed 03/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250882-U

NO. 5-25-0882

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* BRAXTON H., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Vermilion County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-JA-63 |
| | ) | |
| Deandre C., | ) | Honorable |
| | ) | Thomas M. O'Shaughnessy, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Sholar and Bollinger concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court's findings that the father was an unfit parent and that termination of his parental rights was in the best interest of the child were not against the manifest weight of the evidence.

¶ 2   The respondent, Deandre C. (Father), appeals the circuit court of Vermilion County's September 4, 2025, order finding that Father was unfit and the October 22, 2025, order finding that it was in the best interest of the minor to terminate Father's parental rights. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4     On June 26, 2023, the State filed a petition[1] for adjudication of wardship regarding Father's biological child, Braxton H., who was born on June 21, 2023. A "fact sheet" was filed the same day as the petition, which alleged that the minor was neglected because the newborn's system contained a controlled substance; that the minor's environment was injurious to his welfare due to Mother's substance abuse; and that the minor's environment was injurious to his welfare due to Mother's failure to complete services and correct the conditions that had caused another child to come into care following an adjudication of neglect.

¶ 5     On June 26, 2023, the circuit court held a shelter care hearing. Neither Mother nor Father was present at the shelter care hearing. Sarah Sieberns, a Department of Children and Family Services (DCFS) special investigator, testified for the State. Sieberns testified that, on June 22, 2023, DCFS received a hotline call reporting that Mother had given birth to the minor the day before and that the minor had tested positive for methamphetamine and cannabis. Sieberns further testified that Mother was involved in another ongoing DCFS case, 21-JA-87,[2] which was then in the termination phase, and the circuit court took judicial notice of that case. DCFS took protective custody of the minor on June 23, 2023. At the time of the shelter care hearing, Father was reportedly in Terre Haute, Indiana, at a sober-living house, but no contact information was known for him. The circuit court granted shelter care to DCFS.

¶ 6     On June 27, 2023, an affidavit for service by publication was filed stating that Father's address was unknown. On August 30, 2023, the circuit court held a status hearing. DCFS reported

---

[1]The petition also named Haley H. (Mother) as a respondent. Mother's parental rights to Braxton H. were terminated on October 22, 2025, and she separately appealed the trial court's ruling. We will discuss matters related to Mother only to the extent they are pertinent to the resolution of the issues before us.

[2]Another case was opened regarding Mother's older child, Detario, in Vermilion County case No. 21-JA-87. Father is not the biological parent of this child.

that Father had made contact and stated that he was living in Indiana at a sober-living house and was not permitted to enter Illinois.

¶ 7    The circuit court next held a pretrial status hearing on September 27, 2023, at which Father appeared via Zoom. Father was appointed counsel to represent him in the proceedings. A default order was entered against Mother.

¶ 8    On December 13, 2023, the circuit court held a pretrial hearing. Father's counsel was present, but Father was not present. The circuit court noted that Father had not been provided with a Zoom invitation to participate in the hearing before it began, so the court did not fault Father for his absence under the circumstances. Mother again failed to appear. The circuit court set the matter for an adjudicatory hearing and noted that a Zoom invitation would be provided to Father in advance of that setting.

¶ 9    On January 12, 2024, the circuit court held an adjudicatory hearing. Father's counsel was present. Father was not present either in person or by Zoom. Father's attorney stated that he still had not had contact with Father. As the allegations of neglect did not pertain to Father, the circuit court proceeded with the adjudicatory hearing. The State withdrew counts II and III of the petition, and proceeded on count I only, which alleged the minor was born with a controlled substance in his system. The State offered no witnesses, and instead tendered an exhibit to the circuit court. The exhibit is not contained within the record on appeal; however, at the hearing, the circuit court described the exhibit as a document "which shows that the minor was born substance exposed to amphetamines and methamphetamines." The circuit court made an oral pronouncement finding that count I had been established by a preponderance of the evidence. On January 16, 2024, the circuit court entered a written adjudicatory order finding that the minor was abused or neglected under section 2-20 of the Juvenile Court Act of 1987 (705 ILCS 405/2-20 (West 2022)) as a

3

newborn exposed to illicit drugs. The matter was originally scheduled for a dispositional hearing on March 6, 2024; however, the hearing was continued multiple times until it was held on July 26, 2024.

¶ 10    Dispositional reports were filed in advance of the hearing. On April 2, 2024, a dispositional report was filed by One Hope United. The report indicated that Father participated in a telephone interview on September 14, 2023, with Lutheran Child and Family Services social worker Tamica Hatchett and former permanency worker Brianna Coffey. Father reported that he was then residing in a sober-living house in Indiana and was employed. Father had previously provided financial support for the minor and for Mother's other minor child, Detario, who is not involved in this appeal. Father stated that, upon leaving the sober-living house, he planned to return to Illinois and live with family. The caseworker reported that there were no current concerns regarding alcohol or marijuana use and stated that he had not used either substance since February 2023; those representations had been confirmed through random drug screenings at his sober-living house. The report further indicated that Father showed signs of being willing to cooperate with services. DCFS described Father as an "uninvolved subject" in the case. As to visitation, Father was to attend supervised visits with the minor, although the frequency and duration of the visits were not specified. It was recommended that Father continue substance abuse treatment and aftercare, including recovery support groups, continue random drug screenings, and resolve his current legal involvement while avoiding future criminal behavior. At that time, DCFS recommended that Father be found unfit.

¶ 11    On July 26, 2024, the circuit court held a dispositional hearing; Father was present in person and represented by counsel. The parties stipulated to the admission of the dispositional report. The only witness to testify was Lealani Guerrero, a caseworker for One Hope United.

4

Guerrero was called to testify by Father. Guerrero testified that Father no longer lived at the sober-living house and that One Hope United had his current phone number and address. Guerrero further testified that services had not yet been recommended for Father due to pending DNA testing scheduled for August to confirm that he was the minor's biological parent. At that time, Guerrero's recommendation was substitute care pending termination. Next, Father proffered that, if called to testify, he would state that he was willing to participate in any recommended services but preferred to do so in Indiana rather than Illinois. At the conclusion of the hearing, the circuit court adjudicated the minor neglected and made him a ward of the court. The court further found that a return-home goal was appropriate. On the same day, a dispositional order was entered. The order found Father unfit and required him to show evidence of stability, sobriety, and/or the capacity necessary to parent the minor, and to establish paternity.

¶ 12    On October 28, 2024, a permanency report was filed. At that time, Father was unemployed and living in Terre Haute, Indiana. Father had supervised visits with the minor once a week for two hours. On August 8, 2024, DNA testing was completed and confirmed Father's paternity. Father had been referred to substance abuse treatment, parenting classes, and a mental-health assessment. Father failed to appear for drug drops on September 16, 2024, and October 11, 2024.

¶ 13    On October 31, 2024, the circuit court held a permanency review hearing. Father was not present, but his attorney appeared on his behalf. The circuit court stated that a Zoom link had been sent to Father for the hearing; however, Father's attorney indicated that Father reported he had not received the link and had a conflict due to a job interview. The circuit court changed the goal to substitute care pending termination because both parents had failed to engage meaningfully in services.

¶ 14     On November 18, 2024, a petition to terminate parental rights was filed. As to Father, the petition alleged that he (1) failed to maintain a reasonable degree of interest, concern, or responsibility; (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minor from the parent during any nine-month period (January 18, 2024, to October 18, 2024) after an adjudication of neglect, abuse, or dependency; and (3) failed to make reasonable progress toward the return of the minor to the parent during the designated nine-month period of January 18, 2024, through October 18, 2024.

¶ 15     On December 10, 2024, a permanency report was filed. The report stated that Father had not yet started substance abuse counseling because the agency had only recently received the referral, and services had not yet begun. Father also had not yet begun parenting services. Father's last visit with the minor occurred on October 23, 2024. Father failed to attend visits in November due to transportation issues and failures to confirm. Father completed a drug screening on December 10, 2024, after having failed to appear for all prior drug screenings. The results of the drug screening are not stated in the report.

¶ 16     On May 29, 2025, a best-interest report was filed. One Hope United recommended that the minor remain in his current foster placement. The report stated that the minor's needs were being met by the foster family and that he had developed an attachment to them. At the time of the report, Father was incarcerated in the Vermilion County jail. The report further stated that Father had struggled to attend visits and had not completed parenting or substance abuse services. The caseworker recommended that Father be found unable to care for the minor because of his failure to complete services. The report recommended that Father's parental rights be terminated.

¶ 17     On August 7, 2025, a hearing was held on the petition to terminate parental rights of both Father and Mother. Father was present, in the custody of the Vermilion County Sheriff, and he

6

was represented by counsel. Caseworker Guerrero testified on behalf of the State. The following evidence was presented regarding Father.

¶ 18    Guerrero testified that throughout the case, Father was to complete services for parenting, counseling, maintaining housing, and maintaining income. Father was referred to parenting services, but he did not engage in them. Guerrero stated that she did not recall if Father was referred for counseling. Father did not maintain employment or a legitimate stable income. Guerrero testified that Father was presently incarcerated due to gun charges. As to visitation, Father was offered weekly supervised visits with the minor, but was inconsistent with his visitation, having frequent failures to confirm, a procedure required for visitation. He also once failed to attend due to problems with his vehicle. The last time Father exercised visitation was in October 2024.

¶ 19    On cross-examination, Guerrero stated that she could not recall where Father was living in November 2024, but believed he was in Danville, Illinois. Guerrero did confirm that Father had lived in Indiana for a large portion of the case. Guerrero initially stated that Father had been unemployed throughout the case. However, after reviewing the March 25, 2024, dispositional report, she acknowledged that Father had been employed full-time at Chiyoda in Indiana and had also worked at the Terre Haute Humane Society in Indiana. As to recommended services, Guerrero testified that Father had been referred to New Directions for parenting classes and to Crosspoint for mental-health counseling, both of which were Illinois-based services. Guerrero further testified that Father never completed the recommended services.

¶ 20    Guerrero testified that Father was not originally referred for substance abuse services, but after a positive test for methamphetamine, he was referred. Guerrero testified that Father was drug tested weekly by the agency, although she stated that she "can't recall when it did start." When asked whether Father complied with weekly testing requirements, Guerrero testified that he did

7

not. She explained, "the only one was in February of '25, 2025." When asked about the result of that single drug test, Guerrero replied, "That I can't remember." When asked whether Father completed any drug tests after February 2025, Guerrero testified that he had not.

¶ 21 Jessica Wilson, a One Hope United supervisor, testified for the State. Wilson testified that in 2022, in connection with a juvenile case involving Mother's other biological child, Father completed an integrated assessment as Mother's paramour. When asked whether any integrated assessment had been completed after the one in 2022, Wilson replied, "Since then, no."

¶ 22 During Wilson's testimony, technical difficulties with the Zoom platform resulted in the hearing being recessed. When the hearing continued on September 4, 2025, Wilson resumed her testimony. Wilson testified that at the time of Father's departure from the sober-living house in March 2024, Father had completed all required services and was attending visits. Wilson further testified that they were still looking to do "parenting things like that just to kind of keep things updated with the case." Wilson also testified that Father was employed and had his own apartment during that time.

¶ 23 Father then testified on his own behalf. Father stated that, at the outset of the case, no services were recommended to him and that he was residing at a sober-living house in Indiana, where he was completing frequent drug drops. Father testified that he was unable to leave the sober-living house because of his probation in Indiana. He further testified that he was completing classes for Alcoholics Anonymous and Narcotics Anonymous. He was also completing classes recommended in Detario's case because he "was going to step in to adopt Detario *** as paramour or something like that." Father testified that he had completed more than 100 drug drops, all of which were negative.

8

¶ 24　Father testified that, once the DNA test results were returned, he began attending weekly visits with the minor. He stated that he missed "quite a few" visits due to vehicle problems and living in Indiana while on probation. Father further testified that, after leaving the sober-living house, he held three different jobs, which he reported to his caseworker, and rented a two-bedroom apartment in Indiana. Father asserted that he completed all services recommended under his service plan but failed one drug test. Father stated that he did not recall exactly when the failed drug test occurred; when asked whether it was "sometime in the year 2025," he replied, "Yes, it was." Father further testified that, after the failed drug test, he was recommended for additional services: "I failed one drug test. And then after that they said that they was going to help me with getting into a program or a class or something like that." He stated that he missed "drug treatment" services because of problems with his vehicle. Father also testified that he had been in the custody of the Vermilion County Sheriff's Department since May 2025.

¶ 25　As to visitation, Father testified that his visits with the minor went well and that he brought the minor gifts. He stated that he had hoped the visits would "speed up the process." Father also testified that he had some phone contact with the minor, but explained that the minor was young and "ADHD like I am," which made phone communication difficult. Father stated that he would sometimes speak with the minor by phone and would see the minor through FaceTime calls with Mother.

¶ 26　Father further testified that, toward the end of the case, he believed he was no longer allowed to see his son. According to Father, he believed his parental rights had already been terminated. He stated, "I thought that my time was over being able to see them," and, "I thought I was terminated already, but apparently that's not the case." Father explained that he formed this belief after receiving paperwork in the mail and after Mother told him that his rights were being

9

terminated and that he would not be able to see the minor. At the conclusion of his direct examination, Father stated that he did not want his parental rights terminated.

¶ 27 On cross-examination, Father acknowledged that he was aware of the juvenile case concerning Braxton since the time he was born. Father testified that he was on probation in Indiana for a burglary conviction. A condition of Father's probation was that he not use illegal drugs.

¶ 28 In 2024, Father tested positive for methamphetamine and THC. Father linked his substance abuse in 2024 to the minor's hospitalization in March 2024, which caused him to miss work and become depressed. Father further testified that he asked One Hope United for referrals for substance abuse rehabilitation but did not receive any, in part because he was living in Indiana and did not have a vehicle. He also stated that he and his family enrolled him in a 90-day substance abuse program at Springfield Gateway. Father testified that, because of his current incarceration, he was not enrolled in in-person services but had been given access to services on "a tablet" by One Hope United; however, he had not accessed those services.

¶ 29 Father testified that he was presently incarcerated in Vermilion County on weapon charges in case No. 25-CF-335, of which the circuit court took judicial notice. Father stated that he was facing a potential five-year sentence in that case: "They got me at 5 years right now so *** I think they will go down probably just a little bit more. Probably be home around the same time next year, maybe August. But that's without good time." Father further testified that he had previously been sentenced to the Department of Corrections on two other occasions.

¶ 30 At the conclusion of Father's testimony, the parties presented closing arguments. The State asked the circuit court to find Father unfit, arguing that Father had struggled with addiction and, although he had previously made efforts to overcome his substance abuse, he had relapsed after the case began. The State argued that Father sought to blame One Hope United and his mistaken

10

belief that his rights had already been terminated for his shortcomings. The State concluded by arguing that the minor deserved better and that both parents had failed to show interest, concern, or responsibility for the minor.

¶ 31 Father argued that the State failed to prove by clear and convincing evidence that he was unfit. Father maintained that he had made reasonable efforts and reasonable and substantial progress, had completed available services through probation in Indiana, had maintained employment and housing, and had remained in contact with the agency. Father further argued that he demonstrated interest and concern for the minor through visits and gifts and that he attempted to obtain substance abuse treatment after his relapse. He therefore asserted that the evidence was insufficient to sustain the allegations of unfitness.

¶ 32 At the conclusion of argument, the court acknowledged that Father "had a period of time in which he was showing and demonstrating reasonable responsibility." However, the court found that Father failed to demonstrate a reasonable degree of responsibility over the entire course of the case as he failed to complete substance abuse treatment upon his relapse.

¶ 33 The court also found that Father had failed to make reasonable progress during the designated nine-month period, January 18, 2024, to October 18, 2024. The court explained that reasonable progress, at the least, requires demonstrable movement towards reunification. The court noted that Father relapsed only two months into the nine-month period and "did not bring his relapse to the attention of his caseworker or to anyone until 5 months later." The court also noted that Father's relapse was only brought to the caseworker's attention after he failed a drug screening in court. Further, once Father had relapsed he failed to engage "in any substance abuse treatment throughout the remainder of the designated period."

11

¶ 34 Additionally, the circuit court found that Father failed to show reasonable efforts to correct the conditions that were the basis for removal of the minor. The court again noted that "this case is about substance abuse" and "[F]ather relapsed early in that period and did not engage in treatment."

¶ 35 On September 2, 2025, the court-appointed special advocate (CASA) submitted a report to the court for consideration at the termination hearing and the best-interest hearing. The CASA advocate reported that Braxton and his half-brother were having their needs met by their foster parents and that Braxton struggled with visits, stating: "Braxton now recognizes the transporter's vehicle and fights going out to the vehicle. The boys then take a day or two to settle back into their usual routine."

¶ 36 On October 20, 2025, One Hope United filed a best-interest report. The report detailed the statutory best-interest factors and did not find any factors that favored not terminating Father's parental rights. The report stated that the minor appeared to be "thriving in his foster home" and "growing healthy and is always happy in the foster home." Further, there had been no social or emotional concerns, and the foster parents addressed all the needs and "do whatever they can do to ensure" that the minor "continues to thrive and remain happy within the home." The report stated there were no concerns with the current foster placement and that it would be in the best interest of Braxton to terminate the parental rights of Father "so that permanency can be achieved for Braxton."

¶ 37 On October 22, 2025, the circuit court held the best-interest hearing. At the outset of the hearing, the parties stipulated to the best-interest reports filed on May 29, 2025, and October 20, 2025. Guerrero then testified for the State. Guerrero testified that Braxton was placed in a traditional foster home with his half-brother and that she believed he was safe and loved in that

home. She further testified that the minor was well bonded with both foster parents and the foster siblings in the home and that the foster parents were willing to provide permanency for Braxton. Guerrero also testified that Father's last visit with the minor occurred in October 2024, before Father's incarceration. Since his incarceration, Father had not had any communication with the minor.

¶ 38    Father testified on his own behalf. Father stated that he was incarcerated at Stateville Correctional Center and had an expected release date in early 2026. Father further testified that he had "a few jobs lined up" upon release and that he had "a place already, bills already paid *** got two more vehicles." Father testified that he wished to maintain his parental rights to the minor.

¶ 39    The State argued that it was in the minor's best interest for both parents' parental rights to be terminated. Father argued that termination of his rights was not in the minor's best interest. The circuit court found that it was in the minor's best interest that both parents' parental rights be terminated. The court noted that at the outset of the case, Father had been engaged, and both parents had been "relatively consistent" with visitation. The court further stated that both parents had the ability to parent the minor, but "for whatever reasons are unable to deal with issues within their own lives that interfere with and stop them from actually performing their parental responsibilities for their children." The court stated that neither parent had completed recommended services and that Father would not be able to complete them in the near future. The court further observed that "[i]t isn't a question in this case of whether in their own ways the parents love their children because I think they do," but emphasized that the minor needed permanency and a safe home. The court then found that the State established by a preponderance of the evidence that it was in the best interest of Braxton and the public that Father's parental rights be terminated. The court also stated that it had considered all statutory factors in reaching its decision.

¶ 40 A dispositional order after a finding of parental unfitness was filed on October 22, 2025, finding that it was in the best interest of the minor that Father's parental rights be terminated. The order stated that the circuit court considered the following factors: (a) the physical safety and welfare of the child, including food shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachments, including: where the child feels love, attachment, and a sense of being valued, the child's sense of security and familiarity, continuity of affection for the child, and the least disruptive placement alternative for the child; (e) the child's wishes and long-term goals; (f) the child's community ties, including church, school, and friends; (g) permanence for the child; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. This timely appeal followed.

¶ 41                                    II. ANALYSIS

¶ 42 Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2024). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that

14

termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 43 A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). In addition, because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 44 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 45 In making a best-interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense

15

of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

See also 705 ILCS 405/1-3(4.05) (West 2024).

¶ 46    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 47    In the present case, the State alleged three grounds for unfitness: failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); failure to make reasonable efforts to correct the conditions that were the basis for removal of the minor during any nine-month period (*id.* § 1(D)(m)(i)); and failure to make reasonable progress to correct the conditions that were the basis for removal of the minor during the nine-month period of January 18, 2024, to October 18, 2024 (*id.* § 1(D)(m)(ii)). The circuit court found each ground to be proven. Following a best-interest hearing, the circuit court determined it was in the minor's best interest to terminate Father's parental rights.

¶ 48    On appeal, Father contends that the circuit court erred in finding him to be an unfit parent and erred in terminating his parental rights. Father's brief cites to case law regarding the general process in juvenile cases and the determination of unfitness and best-interest factors. Father's argument does not differentiate between the findings of unfitness entered against him, and argues:

"In this case, [Father] was not the parent causing the minor child to be in the Department's custody.[Father] was in a sober living house in Indiana and could not leave

16

Indiana to engage in services. [Father] did all the services for which he was recommended. [Father] visited with his child and provided food, clothes and toys for the child. [Father] had a positive drug screen and asked the Department to help him find services. [Father] did not receive the help he needed from the Department and was on a waiting list for in-patient treatment. [Father] is scheduled for release from prison at the beginning of 2026. [Father] should be given time to be released and engage in his plans to parent his child. The trial court erred in finding [Father] to be an unfit parent and the decision should be reversed."

As to the determination that it was in the minor's best interest to terminate Father's parental rights, Father's brief states:

"[Father] maintained interest, concern, and responsibility for his child. [Father] has a strong commitment to reunification with his child. It is not in the best interest of the minor child that [Father's] parental rights be terminated, it is against the manifest weight of the evidence, and the decision should be reversed."

¶ 49     Father's arguments on appeal as to unfitness and best interest are reiterations of what he presented to the circuit court. Father does not argue that the circuit erred as a matter of law in this case, such as, for example, by failing to follow proper procedure or failing to consider the appropriate statutory factors, or that the circuit court abused its discretion by erring in its admission or exclusion of evidence. Instead, he simply asks this court to reweigh the evidence and reassess the credibility of the witnesses, which is something this court will not do. See, *e.g.*, *In re M.A.*, 325 Ill. App. 3d at 391.

¶ 50     Further, we note that Father's assertion that he completed all recommended services is not supported by the record. After Father's positive drug test, he was re-referred for services, which he did not complete. Additionally, Father's brief, filed in early January 2026, indicated that Father

17

"is scheduled for release from prison at the beginning of 2026"; however, the Illinois Department of Corrections' individual in custody search indicates that Father has a projected parole date in November 2027. We "may take judicial notice of information that the Illinois Department of Corrections provides on its website." *People v. Goods*, 2016 IL App (1st) 140511, ¶ 56.

¶ 51    When making oral pronouncements as to unfitness, the circuit court summarized the testimony that was presented regarding Father. The court considered Father's relapse and his failure to participate in substance abuse treatment following his relapse. The court also considered Father's inconsistent visits with the minor. These findings were consistent with Guerrero's testimony that Father missed several visits and with Father's own testimony regarding his relapse. After weighing all the evidence and assessing the credibility of the witnesses, the circuit court entered an order finding Father unfit.

¶ 52    Turning to the best-interest determination, Father does not allege, nor does the record indicate, that the circuit court failed to consider the enumerated factors when making the best-interests determination. Further, the circuit court's written order explicitly stated the statutory factors considered. The court emphasized that the minor's current foster placement was the least disruptive placement alternative and that neither parent would be able to provide the minor with a safe and appropriate home free from substance abuse. The court also found that neither parent had completed the services necessary for reunification and that nothing suggested those services would be completed in the near future.

¶ 53    As explained above, this court will not reweigh the evidence or reassess the credibility of the witnesses. With regard to all of its findings and conclusions, the circuit court was in the best position to make credibility determinations and weigh the evidence. We have thoroughly reviewed the record on appeal and conclude that it does not demonstrate that the circuit court's findings that

18

Father was unfit and that it was in the minor's best interest to terminate Father's parental rights were against the manifest weight of the evidence.

¶ 54                                    III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the September 4, 2025, and October 22, 2025, orders of the circuit court of Vermilion County.


¶ 56    Affirmed.